No. 22-35986

# In the United States Court of Appeals for the Ninth Circuit

SEATTLE PACIFIC UNIVERSITY,

Plaintiff-Appellant,

v.

ROBERT FERGUSON, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF WASHINGTON,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Washington
Honorable Robert J. Bryan
(3:22-cv-05540-RJB)

## APPELLANT'S OPENING BRIEF

NATHANIEL L. TAYLOR
ABIGAIL ST. HILAIRE
ELLIS LI & MCKINSTRY, PLLC
1700 7th Ave., Suite 1810
Seattle, WA 98101
(206) 682-0565
*ntaylor@elmlaw.com*

*Not admitted to the D.C. bar; admitted to
the N.Y. bar; supervised by licensed D.C.
bar members.*

LORI H. WINDHAM
LAURA WOLK SLAVIS
DANIEL D. BENSON
DANIEL M. VITAGLIANO*
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lwindham@becketlaw.org*

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Seattle Pacific University represents that it does not have any parent entities and does not issue stock.


*/s/ Lori H. Windham*

LORI H. WINDHAM
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
 Suite 400
Washington, DC 20006
(202) 955-0095
*lwindham@becketlaw.org*

Dated: April 3, 2023

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................... iv

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT ............................................... 3

STATEMENT OF ISSUES ...................................................... 3

STATEMENT OF THE CASE ................................................... 4

    A. Factual Background ...................................................... 4

        1. SPU and its religious mission and policies ............................ 4

        2. The WLAD & *Woods v. Seattle's Union Gospel Mission* .................................................................. 7

        3. The AG's probe of SPU under the WLAD & *Woods* .................................................................. 9

    B. Proceedings below ...................................................... 10

        1. Nature of the lawsuit and SPU's claims ............................ 10

        2. District court's decision ............................................ 13

STANDARD OF REVIEW ...................................................... 15

SUMMARY OF ARGUMENT ................................................... 16

ARGUMENT ................................................................... 16

I. SPU has standing to protect its First Amendment rights ...................................................................... 16

A. SPU has suffered the requisite injury to bring a pre-enforcement challenge to the application of the WLAD............................................................................. 17

B. SPU has alleged an injury in fact for its challenge to the investigation and its retaliation claims.............................. 24

C. SPU's injury would be redressed by a favorable decision. ..................................................................... 33

II. *Younger* abstention does not apply. ...................................................... 41

A. This is not a quasi-criminal enforcement action............................ 42

B. Even if the AG's investigation qualifies as a proceeding, such proceeding is not ongoing. ................................... 46

C. SPU has no ability to raise a constitutional challenge during the AG's investigation. ....................................... 51

CONCLUSION ..................................................................... 55

CERTIFICATE OF COMPLIANCE ....................................................... 56

CERTIFICATE OF SERVICE............................................................... 57

ADDENDUM ........................................................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ankenbrandt v. Richards*,
  504 U.S. 689 (1992) ................................................................ 50

*Apex Abrasives, Inc. v. WGI Heavy Minerals, Inc.*,
  737 F. App'x 325 (9th Cir. 2018) ......................................... 22

*Applied Underwriters, Inc. v. Lara*,
  37 F.4th 579 (9th Cir. 2022) ................................... 41, 46, 51

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022) ......................................... 18, 19

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
  602 F.3d 1175 (10th Cir. 2010) ............................................. 31

*Bristol-Myers Squibb Co. v. Connors*,
  979 F.3d 732 (9th Cir. 2020) ................................... 16, 43, 45

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) .............................................. 53

*Cal. Trucking Ass'n v. Bonta*,
  996 F.3d 644 (9th Cir. 2021) ......................................... 21, 23

*Carson ex rel. O.C. v. Makin*,
  142 S. Ct. 1987 (2022) ......................................................... 18

*Citizens for Free Speech, LLC v. County of Alameda*,
  338 F. Supp. 3d 995 (N.D. Cal. 2018) ............................ 43, 45

*Citizens for Free Speech, LLC v. County of Alameda*,
  953 F.3d 655 (9th Cir. 2020) ................................... 45, 46, 52

*Clark v. City of Lakewood*,
  259 F.3d 996 (9th Cir. 2001) ................................................ 35

iv

*Collette v. Archdiocese of Chi.*,
  200 F. Supp. 3d 730 (N.D. Ill. 2016) .................................................... 40

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976) ........................................................................ 41, 42

*Conlon v. InterVarsity Christian Fellowship*,
  777 F.3d 829 (6th Cir. 2015) ................................................................ 29

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) ................................................................ 54

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................. 24

*Demkovich v. St. Andrew the Apostle Par.*,
  3 F.4th 968 (7th Cir. 2021) .................................................................. 28

*Duquesne Univ. of the Holy Spirit v. NLRB*,
  947 F.3d 824 (D.C. Cir. 2020) ............................................................. 26

*EEOC v. Catholic Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996) .......................................................... 28, 30

*Fassl v. Our Lady of Perpetual Help Roman*
  *Catholic Church*,
  No. 05-cv-0404, 2005 WL 2455253 (E.D. Pa. Oct. 5, 2005) ............... 40

*FEC v. Cruz*,
  142 S. Ct. 1638 (2022) ......................................................................... 18

*Fitzgerald v. Roncalli High Sch.*,
  No. 19-cv-04291, 2021 WL 4539199
  (S.D. Ind. Sept. 30, 2021) .................................................................... 40

*Fratello v. Archdiocese of N.Y.*,
  863 F.3d 190 (2d Cir. 2017) ................................................................. 39

*Garmong v. Tahoe Regional Planning Agency*,
  806 F. App'x 568 (9th Cir. 2020) ......................................................... 24

*Garrick v. Moody Bible Inst.*,
    No. 18-cv-573, 2021 WL 5163287 (N.D. Ill. Nov. 5, 2021)............39-40

*Gilbertson v. Albright*,
    381 F.3d 965 (9th Cir. 2004)................................................................ 42

*Grussgott v. Milwaukee Jewish Day Sch.*,
    260 F. Supp. 3d 1052 (E.D. Wis. 2017) ............................................. 40

*Guillemard-Ginorio v. Contreras-Gomez*,
    585 F.3d 508 (1st Cir. 2009) ....................................................46, 48-49

*Haro v. Sebelius*,
    747 F.3d 1099 (9th Cir. 2014)........................................................... 24

*Hosanna-Tabor Evangelical Lutheran Church &
    Sch. v. EEOC*,
    565 U.S. 171 (2012) ............................................................................ 25

*Huffman v. Pursue, Ltd.*,
    420 U.S. 592 (1975) ............................................................................ 41

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ............................................................. 30

*Interpipe Contracting, Inc. v. Becerra*,
    898 F.3d 879 (9th Cir. 2018)............................................................. 24

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018)............................................... 17, 23, 35

*Kirby v. Lexington Theological Seminary*,
    426 S.W.3d 597 (Ky. 2014).................................................................53

*Lee v. Sixth Mount Zion Baptist Church*,
    903 F.3d 113 (3d Cir. 2018) .............................................................. 29

*Louisiana Debating & Literary Ass'n v. City of New Orleans*,
    42 F.3d 1483 (5th Cir. 1995).............................................................. 47

*Major League Baseball v. Butterworth*,
    181 F. Supp. 2d 1316 (N.D. Fla. 2001) .............................................. 49

*Major League Baseball v. Crist,*
  331 F.3d 1177 (11th Cir. 2003) .......................................................... 49

*Maxon v. Fuller Theological Seminary,*
  No. 20-56156, 2021 WL 5882035 (9th Cir. Dec. 13, 2021) ................ 38

*Maya v. Centex Corp.,*
  658 F.3d 1060 (9th Cir. 2011) ............................................................ 24

*McCarthy v. Fuller,*
  714 F.3d 971 (7th Cir. 2013) .............................................................. 28

*Mecinas v. Hobbs,*
  30 F.4th 890 (9th Cir. 2022) ......................................................... 15-16

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
  457 U.S. 423 (1982) ..................................................................... 41, 52

*Miller v. Mitchell,*
  598 F.3d 139 (3d Cir. 2010) ............................................................... 51

*Mulholland v. Marion Cnty. Election Bd.,*
  746 F.3d 811 (7th Cir. 2014) ........................................................ 43, 49

*Myers v. Thompson,*
  192 F. Supp. 3d 1129 (D. Mont. 2016).......................................... 49-50

*Myles v. United States,*
  47 F.4th 1005 (9th Cir. 2022) .............................................................. 4

*Natal v. Christian & Missionary All.,*
  878 F.2d 1575 (1st Cir. 1989) ............................................................ 28

*New Orleans Pub. Serv., Inc. v. Council of City of
  New Orleans,*
  491 U.S. 350 (1989) ........................................................................... 42

*NLRB v. Catholic Bishop,*
  440 U.S. 490 (1979)............................................................ 25, 28, 52-53

*O'Brien v. Welty,*
  818 F.3d 920 (9th Cir. 2016) .............................................................. 29

*Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.*,
  477 U.S. 619 (1986) ................................................................. 43, 45, 52

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) .................................................................. 25, 37

*PDX N., Inc. v. Comm'r N.J. Dep't of Labor &*
  *Workforce Dev.*,
  978 F.3d 871 (3d Cir. 2020) ........................................................ 48, 50

*Perez v. USPS*,
  No. 12-cv-315, 2014 WL 10726125 (W.D. Wash.
  July 30, 2014) ...................................................................................... 22

*Potrero Hills Landfill, Inc. v. County of Solano*,
  657 F.3d 876 (9th Cir. 2011) .................................................. 41, 42, 44

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985) ............................................ 27-28, 39, 53

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*,
  754 F.3d 754 (9th Cir. 2014) ........................................................ 41-42

*Rinedahl v. Seattle Pac. Univ.*,
  No. 21-2-00450-1 SEA (Wash. Super. Ct. King Cnty.
  May 6, 2022) ...................................................................................... 22

*San Jose Silicon Valley Chamber of Com. PAC v.*
  *City of San Jose*,
  546 F.3d 1087 (9th Cir. 2008) ...................................................... 43, 45

*Scharon v. St. Luke's Episcopal Presbyterian Hosps.*,
  929 F.2d 360 (8th Cir. 1991) ............................................................ 28

*Seattle's Union Gospel Mission v. Woods*,
  142 S. Ct. 1094 (2022) ........................................................... 8, 18, 19

*Skyline Wesleyan Church v. Cal. Dep't of Managed*
  *Health Care*,
  968 F.3d 738 (9th Cir. 2020) ............................................................ 35

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ......................................................... 41, 43

*Stabler v. Congregation Emanu-El of the City of N.Y.,*
    No. 16-cv-9601, 2017 WL 3268201
    (S.D.N.Y. July 28, 2017) ....................................................... 40

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .......................................... 16-17, 18, 19, 20, 21, 23

*Telco Communications, Inc. v. Carbaugh,*
    885 F.2d 1225 (4th Cir. 1989) ............................................. 47-48, 50, 54

*The Presbyterian Church (U.S.A.) v. United States,*
    870 F.2d 518 (9th Cir. 1989) ................................................. 31

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ................................................ 21

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ............................................. 21, 23

*Twitter, Inc. v. Paxton,*
    26 F.4th 1119 (9th Cir. 2022) ................................................ 31

*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ............................................. 29, 30, 31-32

*Unified Data Servs., LLC v. FTC,*
    39 F.4th 1200 (9th Cir. 2022) ................................................ 15

*Warth v. Seldin,*
    422 U.S. 490 (1975) .......................................................... 18

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) .............................................. 32, 54

*Whole Woman's Health v. Smith,*
    896 F.3d 362 (5th Cir. 2018) ................................................. 27

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010) ............................................. 33, 34, 36

*Woods v. Seattle's Union Gospel Mission,*
481 P.3d 1060 (Wash. 2021) .................................................... 8, 19, 20

*Woods v. Seattle's Union Gospel Mission,*
No. 17-2-29832-8 (Wash. Super. Ct. King Cnty.
Sept. 1, 2022) ...................................................................................... 8

*Yin v. Columbia Int'l Univ.,*
No. 15-cv-03656, 2017 WL 4296428 (D.S.C. Sept. 28,
2017) .................................................................................................. 40

## Statutes

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 1343 ...................................................................................... 3

42 U.S.C. § 1983 ...................................................................................... 3

Ohio Rev. Code Ann. § 4112.05 ............................................................. 43

RCW 49.60.040 ................................................................................... 7, 19

RCW 49.60.180 ...................................................................................... 19

RCW 49.60.240 ...................................................................................... 44

RCW 49.60.250 ...................................................................................... 44

## Other Authorities

Fed. R. App. P. 4 ...................................................................................... 3

## INTRODUCTION

Seattle Pacific University is a religious university that hires people who live out its religious beliefs. SPU's religious hiring policies have long been protected by the First Amendment, Title VII, and the Washington Law Against Discrimination (WLAD). But things changed in 2021: the Washington Supreme Court reinterpreted the WLAD. Now the WLAD's exemption for religious employers is much narrower. So narrow, according to Washington's attorney general, that it prohibits religious hiring policies like SPU's.

SPU believes this is a violation of the First Amendment. SPU has standing to bring a pre-enforcement challenge to the state law. The Supreme Court and this Court permit pre-enforcement challenges to state laws that chill First Amendment rights.

So far, so good. But one wrinkle: SPU filed this lawsuit after the AG sent a letter to SPU announcing an investigation into whether SPU's policies violate the WLAD. For good measure, he also demanded that SPU turn over half a decade's worth of employment records about every position at the school. This ought to mean that SPU's standing to sue is obvious, as SPU clearly faces a credible threat of enforcement.

Yet the district court ruled otherwise. It held that the investigation meant that SPU's case could not be heard in federal court. The district court held that it could not redress SPU's injuries because a federal court could not change state law or enjoin the AG's investigation. The district

1

court also decided that the investigation letter was enough to trigger *Younger* abstention.

That's incorrect on every point. SPU never asked the district court to change state law. SPU is bringing an as-applied constitutional challenge, since some applications of the state law would violate its First Amendment rights. SPU was correct to ask the district court to enjoin the AG. That's the right way to bring this kind of pre-enforcement challenge.

That's especially true here, since the parties agree that SPU has some First Amendment protection for religious hiring, but they disagree over the scope of that protection. Federal courts can—in fact, must—adjudicate that dispute. And the AG investigation itself creates additional constitutional injuries: government entanglement in religious decision-making and retaliation by the AG. Those facts make the constitutional injuries worse, not better, and injunctive relief more, not less, effective.

Finally, *Younger* abstention doesn't apply. *Younger* applies to state court actions and quasi-criminal proceedings, and the AG's investigation is not that kind of proceeding. Nothing has been filed in state court, and the AG has no special adjudicatory powers under the WLAD. Even if it were the right kind of proceeding, it is at the wrong stage. Multiple courts of appeals have held that an investigation, without more, is not an "ongoing" proceeding under *Younger*. SPU brought its challenge at

exactly the right moment: after an investigation showed enforcement was likely but before any state enforcement proceedings began. Even if there were an "ongoing" proceeding, *Younger* still wouldn't apply, since SPU doesn't have any way to bring its constitutional claims as part of the current investigation. It needs federal courts for that.

Under the district court's ruling, there is never a right time for SPU's pre-enforcement challenge. Either it is too early, and SPU has no injury, or too late, and *Younger* abstention applies. That's contrary to this Court's precedent: SPU brought the right kind of challenge, in the right place, and at the right moment. This lawsuit is neither too early nor too late—it is right on time. The district court should be reversed, and SPU's case should go forward.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983 and the First Amendment. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order of dismissal. The district court dismissed SPU's complaint and entered a final judgment on October 26, 2022, ER-3-4, and SPU timely filed its notice of appeal on November 23, 2022, ER-119; *see* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

1. Whether SPU has Article III standing to bring a pre-enforcement challenge to a state law, to challenge an intrusive and entangling

government investigation into religious decision-making, and to allege First Amendment retaliation.

2. Whether the mere fact of an investigation by a state attorney general, without any other state court or administrative proceedings, triggers *Younger* abstention.

### STATEMENT OF THE CASE

**A. Factual Background[1]**

**1. SPU and its religious mission and policies**

Seattle Pacific University (SPU) is a private, Christian liberal arts university. ER-79 ¶ 17. It is committed to graduating people of competence and character and to modeling a grace-filled community, and it strives to give students a transformative and holistic college experience. ER-80 ¶ 18. SPU was founded in 1891 as a seminary to "maintain, conduct and operate an institution of learning … under the auspices of the Free Methodist Church." ER-79 ¶ 17; ER-80 ¶ 19. SPU has been associated with the Free Methodist Church ever since. ER-80 ¶ 19; ER-82 ¶ 26.

The Free Methodist Church is an evangelical Protestant denomination with ministries in the United States and in 100 countries around the

---

[1] Because this appeal arises from a Rule 12 dismissal, the following facts are taken from SPU's First Amended Complaint and must be accepted as true. *Myles v. United States*, 47 F.4th 1005, 1010 (9th Cir. 2022).

world. ER-80 ¶ 20. Theologically, the Free Methodist Church is best described by its five value statements entitled "The Free Methodist Way": Life-Giving Holiness, Love-Driven Justice, Christ-Compelled Multiplication, Cross-Cultural Collaboration, and God-Given Revelation. *Id.* The name "Free" Methodist derives from its founder's opposition to slavery, as well as clergy domination, secret societies, and pew rents. ER-80 ¶ 21.

The Free Methodist Church recognizes SPU as one of its denominational institutions. ER-82 ¶ 26. SPU's commitments are consistent with the theology, mission, and character of the Free Methodist Church. *Id.* To ensure this consistency, SPU requires its president and at least one-third of all members of its board of trustees to be Free Methodists. ER-82 ¶¶ 27-28. Whether they are Free Methodists or members of other Christian denominations, each year, the trustees must reaffirm their "continued commitment to the mission and faith statement of the University." ER-82 ¶ 28 (citing Bylaws, Article III, Section 6).

Free Methodists hold sincere religious beliefs about sex and marriage. ER-81 ¶ 25. They believe sexual intimacy is a gift from God and a great blessing in the sanctity of marriage between one man and one woman. *Id.* They also believe that premarital sexual intimacy betrays the marital bond and that same-sex sexual intimacy is not in keeping with God's best

intention for the human family. *Id.* The Free Methodist Church has consistently held these views since its founding in 1860. *Id.*

SPU has adopted a statement of faith and other guiding policies consistent with its Christian, Free Methodist beliefs. ER-82 ¶ 29. SPU's Statement of Faith is structured around four pillars: "historically orthodox, clearly evangelical, distinctively Wesleyan, and genuinely ecumenical." *Id.* SPU's guiding policies include its religious beliefs about human sexuality and marriage, which are contained in SPU's employee conduct policies. *Id.*

SPU's sincere religious beliefs about human sexuality and marriage are consistent with those of the Free Methodist Church. ER-83 ¶ 31. SPU's Statement on Human Sexuality provides the basis for and the definitions of the University's beliefs about marriage and human sexuality, including that marriage is a covenant between a man and a woman, and that sexual experience is intended between a man and a woman in marriage. ER-82-83 ¶ 30; *see* ER-112 (Statement on Human Sexuality "affirm[ing] that sexual experience is intended between a man and a woman" within "the covenant of marriage between a man and a woman"). The Statement emphasizes that discussions of religious belief and sexuality "must be treated with personal and spiritual sensitivity and with scholarly care." ER-83 ¶ 30; ER-112.

It is essential to SPU's religious mission that SPU maintain a faculty and staff that affirm its guiding policies and live out the Christian faith.

6

ER-83 ¶¶ 32-33. SPU accordingly requires its faculty and staff (except for student and temporary employees) to affirm its Statement of Faith and to abide by conduct standards consistent with its religious beliefs. ER-83 ¶ 31. One standard prohibits sexual intimacy outside a traditional marriage—that is, between a man and a woman. *Id.* Permitting employment of Christians in same-sex marriages would frustrate SPU's mission, violate its faith, and end its longstanding affiliation with the Free Methodist Church. ER-83-84 ¶ 34.

Despite pushback from some SPU students and faculty members, as well as pressure from the local media and community, SPU's board of trustees recently voted to retain the University's existing religious employee conduct policies. ER-84-85 ¶¶ 35-40. This prompted "hundreds" of complaints to Washington Attorney General Robert Ferguson by SPU students, faculty, and others who disagree generally with SPU's religious beliefs and hiring policies. ER-85 ¶¶ 41-45; *see* ER-118.

## 2. The WLAD & *Woods v. Seattle's Union Gospel Mission*

Until recently, the Washington Law Against Discrimination protected SPU's right to hire according to its faith. The WLAD's employment provision categorically exempts "any religious or sectarian organization not organized for private profit." RCW 49.60.040(11). But in 2021, the Washington Supreme Court invalidated much of this exemption, stripping away express legislative protections for religious employers.

*See generally Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021).

In *Woods*, the Washington Supreme Court held that the statutory exemption would violate the state constitution if it permitted sexual orientation discrimination by religious employers. The portion of the exemption that remains applies to employees who qualify as "ministers" under the First Amendment's "ministerial exception." *Id.* at 1069-70. The court, however, did not address other First Amendment rights of religious organizations. *See id.* at 1070.

This led two Justices of the United States Supreme Court to note that the *Woods* decision "may … have created a conflict with the Federal Constitution." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., joined by Thomas, J., concurring in the denial of certiorari) ("*SUGM*"). The Justices explained that "the guarantee of church autonomy is not so narrowly confined" as *Woods* presumed. *Id.* They indicated that "[t]he Washington Supreme Court's decision may warrant our review in the future," but decided this was not the right time because the state court was still considering other First Amendment arguments. *Id.* at 1096-97.

On remand, however, the plaintiff voluntarily dismissed his complaint. *See* Order of Dismissal Without Prejudice, *Woods v. Seattle's Union Gospel Mission*, No. 17-2-29832-8 (Wash. Super. Ct. King Cnty. Sept. 1, 2022). This left the Washington Supreme Court's

reinterpretation of the WLAD in place, while preventing the U.S. Supreme Court from addressing the full scope of religious employers' First Amendment rights.

### 3. The AG's probe of SPU under the WLAD and *Woods*

In May 2022, SPU students organized a sit-in at the University President's office to protest the school's employee sexual conduct standards. ER-85 ¶ 40. The protest received national media attention, and some of the protesters complained to AG Ferguson. ER-85 ¶¶ 40-41. On June 8, 2022, the AG sent a letter to SPU announcing a probe under the WLAD and *Woods* into whether SPU discriminates based on sexual orientation in its hiring, "including by prohibiting same-sex marriage and activity." ER-86 ¶ 46; *see* ER-106-09.

The letter demands production of voluminous and sensitive internal information on SPU's religious hiring policies. ER-86 ¶ 46; *see* ER-106-09. The AG seeks, without limitation, information on "every instance" where SPU's policies relating to sexuality and marriage have been applied in hiring decisions, discipline, and employment disputes with "each" and "any" "prospective, current, or former faculty, staff, or administrator." ER-86-87 ¶¶ 47-51, 54; *see* ER-106-09. The letter also directs SPU to implement a document retention policy, or litigation hold, and attest to it "under the penalty of perjury." ER-88 ¶ 55; ER-107, 109. The letter makes no limitations or accommodations based upon SPU's

9

First Amendment rights or the religious exemption to the WLAD. ER-86 ¶ 48; ER-87 ¶¶ 52-54; ER-88-89 ¶¶ 56-61.

SPU sought clarification from the AG's office on the scope of the probe, raised constitutional challenges to the probe, and challenged the AG's interpretation of federal and state law. ER-89 ¶ 62; ER-114-16. In response, an assistant AG objected that SPU did not provide the requested documents, dismissing SPU's inquiries as "rhetorical." ER-89 ¶ 62; ER-114. The assistant AG also emphasized the AG's personal oversight of the probe. ER-89 ¶ 62; ER-114. SPU alleges that the AG is specifically targeting it due to its religious beliefs about sexuality and marriage. *See* ER-85 ¶ 45; ER-86 ¶ 49; ER-87 ¶ 52; ER-89-90 ¶¶ 63-64.

### B. Proceedings below

#### 1. Nature of the lawsuit and SPU's claims

On July 27, 2022, SPU filed this lawsuit, seeking protection against the AG's intrusive investigation. ER-121. The AG responded with a press release, attempting to justify his actions by pointing to the complaints his office received. ER-90 ¶ 67; ER-118. He also called for more complaints to be filed against SPU. ER-90 ¶ 68; ER-118. The AG then moved to dismiss. His motion made it clear that he intends to continue the investigation of all employees and administrators, to decide for himself who is and is not a minister, and to enforce the WLAD against SPU for employees whom he deems not to qualify as "ministers" under the First Amendment. ER-91-92 ¶¶ 74-76; ER-122. SPU then filed an

amended complaint. ER-77-118.

SPU's amended complaint asserts eleven causes of action, which fall into three categories: (1) pre-enforcement First Amendment claims challenging the application of the WLAD to SPU, (2) First Amendment church autonomy and ministerial exception claims challenging the AG's investigation, and (3) First Amendment retaliation claims.

*First*, Counts II, VI, VII, IX, and X are pre-enforcement First Amendment claims challenging the application of the WLAD, as interpreted in *Woods*, to SPU. SPU challenges both the application of the WLAD to its religious policies generally, as well as the specific manner in which the AG seeks to apply the WLAD. Count II alleges that application of the WLAD to SPU over its religious hiring policy, regardless of ministerial status, interferes with church autonomy. ER-93-94 ¶¶ 85-94. Count VI alleges that the WLAD violates the Free Exercise Clause because it is not generally applicable. ER-97-98 ¶¶ 122-31. Count VII alleges that the AG has treated SPU differently due to its religious denominational affiliation. ER-98 ¶¶ 132-37. Count IX alleges that application of the WLAD would violate SPU's assembly rights. ER-100 ¶¶ 154-60. Count X alleges that application of the WLAD would violate SPU's expressive association rights. ER-100-01 ¶¶ 161-71.

*Second*, Counts III, IV, V and VIII challenge the AG's investigation under the First Amendment's Free Exercise Clause, church autonomy doctrine, and the ministerial exception. Count III alleges that the AG's

11

investigation into SPU's religious matters and hiring practices unconstitutionally impinges on church autonomy. ER-94-95 ¶¶ 95-102. Count IV alleges that the AG's investigation runs afoul of the ministerial exception by interfering with SPU's right to select and retain ministerial employees. ER-95-96 ¶¶ 103-09. Count V alleges that the AG is not applying the WLAD in a generally applicable manner by targeting SPU. ER-96-97 ¶¶ 110-21. Count VIII alleges that the AG is not neutrally enforcing the WLAD by targeting SPU in violation of the Free Exercise Clause. ER-99-100 ¶¶ 138-53.

*Third*, Counts I and XI are First Amendment retaliation claims. Count I alleges that the AG's investigation is retaliation for SPU's exercising its First Amendment rights of religion, speech, and association through its religious hiring policies. ER-92-93 ¶¶ 79-84. Count XI alleges that the AG's call for more complaints is retaliation for SPU exercising its First Amendment right under the Petition Clause to file this lawsuit. ER-101-02 ¶¶ 172-78.

SPU's amended complaint seeks declaratory and injunctive relief. It seeks a declaration that the First Amendment protects SPU's autonomy and ability to make religious employment decisions free from government interference, that the WLAD cannot be applied to SPU in a manner that violates its First Amendment rights, and that the AG cannot target SPU with investigations or enforcement actions in a retaliatory or non-neutral manner. ER-102-03 ¶¶ a-e. It also seeks an injunction that would

prohibit the AG from enforcing the WLAD against SPU's employment decisions regarding ministerial employees, enforcing the WLAD against SPU's religious conduct standards for any employees, requiring SPU to provide information as part of the current investigation, or retaliating against SPU through investigations or enforcement actions or by otherwise applying the law against SPU in a targeted or non-neutral way. ER-103 ¶¶ f-i.

The AG moved to dismiss SPU's amended complaint under Rules 12(b)(1) and (6), arguing that SPU lacks standing, that the case is not ripe, that *Younger* abstention applies, and that SPU's claims fail on the merits.

## 2. District court's decision

On October 26, 2022, the district court held oral argument on the AG's motion to dismiss. During argument, the district court mischaracterized SPU's First Amendment claims as "asking [the court] to change the [WLAD]" after "the *Woods* case that made the minister exception important." ER-30. The court added: "There is a limit as to where a federal court can go in applying the federal Constitution over law that is on the books as a state law. A court can't monkey with that unless there is a clear showing of a generalized … federal constitutional violation." *Id.* SPU explained that it was not asking the court "to change" state law but to "look at a question that was left open" in *Woods* and "how does the federal Constitution interact with the state law." ER-30-31; *see also* ER-

33 ("we are asking for pre-enforcement review of those [state] laws").

After argument, the district court granted the AG's motion to dismiss from the bench. *See* ER-43, ER-3. The bench ruling is found at ER-36 to 43. The court prefaced its ruling by stating that "there would be no benefit to attempt to separate out some of the prayers or some of the claims made in separate paragraphs in analyzing the motion to dismiss." ER-37. It then dismissed SPU's complaint *in toto* on two grounds: (1) failure to establish Article III standing; and (2) *Younger* abstention.

As to standing, the district court "assume[d]" that SPU's amended complaint "allege[d] an injury in fact caused by defendant's conduct." ER-37-38. But it held that SPU's alleged injuries were not redressable, considering the declaratory and injunctive relief sought in the amended complaint. ER-38-40.

The district court reasoned that it "doesn't have the power to grant" the requested declaratory relief because federal courts "don't issue advisory opinions, and it is not appropriate for the Court to do so." ER-38. The court then characterized the requested injunctive relief as seeking "a change to the [WLAD], or for limits to it"; "limits on the state attorney general's investigatory authority"; and "a determination" of which SPU employees qualify as "ministers." ER-38-39. The court explained that it "doesn't have the power to change the state law" and "cannot change" "the authority of the [AG] to investigate." ER-38, ER-40 (claiming SPU seeks "an examination into state law that this Court

14

cannot perform"). The court also said it could not determine "who is a minister." ER-39-40.

As to *Younger* abstention, the district court held that the AG's investigation and "plan to continue the investigation" constituted an "ongoing civil proceeding." ER-41. The court deemed the investigation a "quasi-criminal enforcement action" based on the "possibility" that it "could lead to enforcement." ER-42. The court found that the WLAD "implicate[d] an important state interest, the elimination of discrimination based on sexual orientation," and that SPU's "federal law challenges" can be raised in the investigation like "in any state proceeding." *Id.* Finally, the court held that this action would "effectively enjoin the state proceedings" because the injunctive relief SPU seeks would "halt" the AG's "attempt[] to investigate [WLAD] violations." *Id.* Because "[t]his case started out as a state case," the court concluded, "it belongs in that forum." ER-43.

The district court entered a written order granting the AG's motion to dismiss "[f]or the reasons provided in [its] oral opinion" and dismissing the case. ER-3. The district court did not address the AG's Rule 12(b)(6) arguments, resting exclusively on standing and *Younger* abstention.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal under Rule 12(b)(1) for lack of standing. *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1209 (9th Cir. 2022). The Court "must accept as true all material

allegations of the complaint, and must construe the complaint in favor of the complaining party." *Mecinas v. Hobbs*, 30 F.4th 890, 895-96 (9th Cir.), *cert. denied*, 143 S. Ct. 525 (2022). This Court also reviews *de novo* a district court's *Younger* abstention determination. *Bristol-Myers Squibb Co. v. Connors*, 979 F.3d 732, 735 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2796 (2021).

## SUMMARY OF ARGUMENT

SPU has standing to bring its claims. It brought three different types of claims: (1) pre-enforcement challenges to the constitutionality of state law, (2) challenges to the constitutionality of the AG's investigation into its religious decision-making, and (3) retaliation claims based upon the AG's enforcement actions. SPU has identified an injury in fact with regard to each claim, and each type of claim can be redressed by the types of relief that SPU requested.

*Younger* abstention is not warranted. The AG's investigation is not the kind of quasi-criminal enforcement proceeding that qualifies for *Younger* abstention. And even if it were, it is not an "ongoing" proceeding. Nor does the investigation provide any way for SPU to raise constitutional challenges. To rule otherwise would create a 5-1 circuit split.

## ARGUMENT

## I. SPU has standing to protect its First Amendment rights.

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the

conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up). "[W]hen the threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1172 (9th Cir. 2018).

The district court "assume[d]" that SPU's complaint "does allege an injury in fact caused by defendant's conduct." ER-37. But the court nonetheless dismissed the complaint for lack of standing because it concluded that SPU's alleged injuries were not redressable. ER-38. This was error. SPU has standing to bring each of its First Amendment claims.

## A. SPU has suffered the requisite injury to bring a pre-enforcement challenge to the application of the WLAD.

In a First Amendment pre-enforcement challenge, a plaintiff shows an injury in fact when (1) the plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) the plaintiff's "future conduct is arguably proscribed by the statute [it] wish[es] to challenge," and (3) there exists a "credible threat of enforcement." *Driehaus*, 573 U.S. at 160, 162, 167 (cleaned up). SPU's pre-enforcement challenges to the WLAD meet all three criteria.

*First*, SPU has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest. SPU alleges that its religious hiring standards are a religious exercise and are an important

way that SPU expresses its religious teachings and carries out its religious mission. *See* ER-83-84 ¶¶ 31-34; ER-100 ¶¶ 155-57; ER-101 ¶¶ 162-63. SPU also alleges that a portion of its hiring policy—its statement of faith and religious conduct standards—is protected by the First Amendment regardless of whether the employee is a "minister." *See* ER-93-95 ¶¶ 85-102; ER-96-101 ¶¶ 110-71; ER-52-62. The Supreme Court has warned that "scrutinizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism." *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 2001 (2022); *see also SUGM*, 142 S. Ct. at 1094 (Alito, J.) (collecting cases "protect[ing] the autonomy of religious organization[s] to hire personnel who share their beliefs").

While the AG may view the First Amendment differently, that is a merits question, and "the Supreme Court has cautioned that standing 'in no way depends on the merits.'" *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). At this stage, the Court must view the law "through [SPU's] eyes" and "must accept—for standing purposes—its allegations that the [WLAD] is unconstitutional[]." *Id.*; *accord FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022) ("For standing purposes, we accept as valid the merits of appellees' legal claims[.]"). SPU's religious hiring standards are thus at least "arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 159.

*Second*, SPU's conduct is also arguably proscribed by the WLAD. To

make this assessment, the Court "first examine[s] what conduct is proscribed by the [challenged law] to evaluate whether [the plaintiff's] desired course of conduct falls under the provision's sweep." *Yellen*, 34 F.4th at 849. The plaintiff need not "explicitly confess to intended future conduct that is violative of the law it seeks to challenge." *Id.* at 849-50; *accord Driehaus*, 573 U.S. at 163. Rather, it is enough to allege an intention to engage in conduct that is "arguably proscribed." *Driehaus*, 573 U.S. at 163.

The WLAD prohibits an "employer" from discriminating against an employee or prospective employee "because of … sexual orientation." RCW 49.60.180. The text exempts religious organizations like SPU from the definition of "employer." RCW 49.60.040. But *Woods* significantly narrowed that exemption. As the AG describes it, *Woods* "held that, in order to avoid a conflict with a provision of the Washington Constitution that prohibits special treatment for favored entities, the WLAD's religious-employer exemption is limited to employees who are 'ministers' as defined by the U.S. Supreme Court's First Amendment jurisprudence." ER-65 (citing *Woods*, 481 P.3d at 1067, 1069); *see also SUGM*, 142 S. Ct. at 1094 (Alito, J.) ("[I]t held that if that state exemption applied to employment decisions beyond those involving church ministers, such an exemption would violate the Washington State Constitution's protection for other individual rights and could become a 'license to discriminate.'").

In line with its Free Methodist beliefs about marriage and human

19

sexuality, SPU prohibits all regular faculty and staff "from engaging in sexual intimacy outside of marriage … between one man and one woman." ER-83 ¶ 31. SPU views its conduct standards as an expression of its sincere religious beliefs, not as discrimination. But Washington's AG sees things differently. Indeed, the employer's sexual conduct policy in *Woods* had similarities to SPU's. *Woods*, 481 P.3d at 1073 (Stephens, J., dissenting in part and concurring in part) ("As a condition of employment, SUGM requires employees to obey a biblical moral code that excludes 'homosexual behavior.'"). The Court found that exempting a religious employer with such a policy from the WLAD, at least as to non-ministers, conflicted with "fundamental rights of state citizenship: the right to one's sexual orientation as manifested as a decision to marry." *Woods*, 481 P.3d at 1067 (majority opinion).

Furthermore, according to the AG, the WLAD prohibits SPU from applying its religious hiring standards to non-ministers. The AG could not be clearer: "First Amendment … protections *do not* extend to discrimination against any [of] the University's non-ministerial employees, to whom the WLAD's prohibition of employment discrimination on the basis of sexual orientation *would apply*." ER-91 ¶ 74 (emphasis added); *accord* ER-64-65, ER-66-69, ER-71-72, ER-76. SPU need only show its conduct is "arguably proscribed," and it has done so. *Driehaus*, 573 U.S. at 163.

*Third*, there is a credible threat that the WLAD will be enforced against SPU. A credible threat means that "the prospect of future enforcement" is not merely "imaginary or speculative." *Id.* at 165. To assess the likelihood of enforcement, this court considers "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)), *reh'g en banc denied*, 57 F.4th 1072 (9th Cir. 2023), *petition for cert. filed* (Mar. 27, 2023).

Where a plaintiff "maintain[s] policies that are presently in conflict with [the challenged law], according to the allegations in the complaint," the plaintiff is "deemed to have articulated a concrete plan to violate it." *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2903 (2022) (cleaned up). Here, the complaint makes clear that SPU has applied and will continue to apply its sexual conduct policies to all regular faculty and staff, ministers and non-ministers alike. ER-77-78 ¶¶ 3-4; ER-82-85 ¶¶ 29-39.

The enforcing authority has also communicated a specific warning or threat. The AG is investigating SPU's religious hiring standards. The AG claims that hundreds of complaints have been filed against SPU for its religious hiring standards, and he called for more after SPU commenced

this suit. ER-85 ¶ 43; ER-90 ¶¶ 66-68; ER-118. The AG notified SPU that its policies "prohibiting same-sex marriage and activity" may "violate the Washington Law Against Discrimination" and demanded half a decade's worth of confidential employment records to "ensure that the University is in compliance with its legal obligations regarding workplace discrimination." ER-106. The AG also instructed SPU to initiate a litigation hold and certify to it under penalty of perjury. ER-107, 109. But the duty to preserve documents arises only when "litigation [is] reasonably foreseeable." *Apex Abrasives, Inc. v. WGI Heavy Minerals, Inc.*, 737 F. App'x 325, 327 (9th Cir. 2018); *accord Perez v. USPS*, No. 12-cv-315, 2014 WL 10726125, at *2 (W.D. Wash. July 30, 2014) (notice of government investigation triggered duty). The AG also issued a press release "confirming that his office is investigating potential illegal discrimination" by SPU and promising that he would "uphold Washington's law prohibiting discrimination, including on the basis of sexual orientation." ER-118. The AG cannot simultaneously insist that SPU's conduct is illegal and litigation is reasonably foreseeable, yet claim it is not a credible threat.

Finally, SPU has already been sued for its religious hiring standards in the short time since *Woods* reinterpreted the WLAD to apply to religious nonprofits. ER-84 ¶ 37; *see Rinedahl v. Seattle Pac. Univ.*, No. 21-2-00450-1 SEA (Wash. Super. Ct. King Cnty. May 6, 2022) (dismissed with prejudice pursuant to settlement). The existence and past use of this

"private … right of action" further shows the threat to SPU's First Amendment rights. *Italian Colors*, 878 F.3d at 1173; *accord Driehaus*, 573 U.S. at 164 (looking to past enforcement by private complainants).

SPU's evidence of a credible threat of enforcement is far greater than the evidence this Court has found sufficient in other cases. For example, in *Tingley*, AG Ferguson had not "issued a warning or threat" to the plaintiff, and no complaints had been filed against the plaintiff. *Tingley*, 47 F.4th at 1068. But the AG's office "ha[d] not disavowed enforcement and instead ha[d] confirmed that it will enforce the ban on conversion therapy 'as it enforces other restrictions on unprofessional conduct.'" *Id.* That "weigh[ed] in favor of standing." *Id.*; *accord Driehaus*, 573 U.S. at 165. Likewise, in *Italian Colors*, the plaintiffs "concede[d] that California ha[d] not communicated any threat or warning of impending proceedings against them." 878 F.3d at 1173. But "[a]t a hearing on the cross-motions for summary judgment, the Deputy Attorney General refused to stipulate that California will not enforce the statute." *Id.* This made plaintiffs' "fear of an enforcement action against them … reasonable." *Id.*; *accord Bonta*, 996 F.3d at 653 ("Here, the state's refusal to disavow enforcement of AB-5 against motor carriers during this litigation is strong evidence that the state intends to enforce the law and that CTA's members face a credible threat."). In this case, the additional threats—hundreds of complaints, an AG investigation into SPU, and the demand for years' worth of employment records—makes enforcement far *more* likely than in those

23

cases. In short, SPU faces a credible threat that the WLAD will be enforced to prohibit its religious hiring standards.

The decision below ought to be reversed on this basis alone. "When the district court dismissed [Plaintiff]'s amended complaint for lack of Article III standing, it did so without conducting a claim-by-claim analysis. This was error." *Garmong v. Tahoe Regional Planning Agency*, 806 F. App'x 568, 571 (9th Cir. 2020); *contra* ER-37 (refusing "to separate out some of the prayers or some of the claims made in separate paragraphs in analyzing the motion to dismiss"). This court has repeatedly stated that standing is assessed independently "for each claim[.]" *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)); *accord, e.g.*, *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 903-04 (9th Cir. 2018). And it has remanded cases where plaintiffs had standing for some, but not all, claims. *See, e.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1073 (9th Cir. 2011); *Garmong*, 806 F. App'x at 571. This error alone necessitates reversal.

### B. SPU has alleged an injury in fact for its challenge to the investigation and its retaliation claims.

In addition to its pre-enforcement standing, SPU has also shown injuries stemming from the investigation into its internal religious decisions, as well as the retaliatory nature of the investigation.

SPU has demonstrated a cognizable injury stemming from the investigation of its employment decisions and intrusion into its internal

religious decision-making. Rights to church autonomy and freedom in ministerial decisions are not only defenses to liability in certain employment disputes. They are an affirmative bar against government interference in "the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Government officials must avoid intrusion upon such decisions because "the mere adjudication of such questions would pose grave problems for religious autonomy." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 205-06 (2012) (Alito, J., joined by Kagan, J., concurring). In such cases, "[i]t is not only the conclusions that may be reached by the [government official] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979). "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 140 S. Ct. at 2060.

SPU pleaded facts sufficient to show that the AG is attempting to interfere with and influence internal management decisions essential to the University's central mission. The AG's wide-ranging investigation,

which seeks information related to a religious employment policy, over a five-year period, for all employees, exceeds constitutional limits.

The D.C. Circuit recently applied this principle to the employment decisions of religious universities. There, the NLRB decided that it could exercise jurisdiction over adjunct faculty at religious universities, so long as they worked in secular departments and not the theology department. *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 827 (D.C. Cir.), *reh'g en banc denied*, 975 F.3d 13 (D.C. Cir. 2020). The DC Circuit held that the NLRB lacked jurisdiction over the adjunct faculty, explaining that "the Religion Clauses establish a 'scrupulous policy ... against a political interference with religious affairs.'" *Id.* at 827-28. To rule otherwise, the court reasoned, would end "with the Board trolling through the beliefs of the University, making determinations about its religious mission and whether certain faculty members contribute to that mission. This is no business of the State." *Id.* at 835 (cleaned up).

The same is true here. The AG asserts the power to investigate *all* employment decisions of a religious university, to troll through the beliefs of the University, and to make determinations about which employees are sufficiently religious. The First Amendment prohibits entangling inquiries like this one. An injunction is necessary to stop this violation of SPU's First Amendment rights. The DC Circuit declined to allow the NLRB to exercise jurisdiction on that basis, and this Court should, at

minimum, allow SPU to proceed with its challenge to the AG's attempt to undertake an even more intrusive investigation.

SPU challenges the investigation now because the investigation itself—not just the ultimate conclusions—transgresses constitutional bounds. The Fifth Circuit considered a similar question in a case involving third-party discovery into internal religious communications. It explained, "That internal communications are to be revealed not only interferes with [Texas Catholic Conference of Bishops]'s decision-making processes on a matter of intense doctrinal concern but also exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government." *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018), as revised (July 17, 2018). The Fifth Circuit stated that the district court should not have "waved away TCCB's privilege claims." *Id.* at 374. Here, scrutiny of and interference with SPU's self-government is the object of the investigation.

Multiple circuits in ministerial exception cases have followed the Supreme Court's lead in cases like *Catholic Bishop* and determined that intrusive inquiries into ministerial disputes are themselves problematic. In one of the earliest ministerial exception cases, the Fourth Circuit warned that in Title VII lawsuits by ministers, "the very process of inquiry" can "infringe on rights guaranteed by the Religion Clauses," when "[c]hurch personnel and records would inevitably become subject to subpoena, discovery, [and] cross-examination," unleashing the "full

panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).

The Seventh Circuit, in a recent en banc decision, warned against the "prejudicial effects of incremental litigation." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 980-82 (7th Cir. 2021) (en banc). Other appellate decisions have likewise recognized that intrusive inquiries into ministerial employees are a constitutional problem. *See, e.g.*, *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013) (church autonomy is "akin to … official immunity," which protects "from the travails of a trial and not just from an adverse judgment"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 466-67 (D.C. Cir. 1996) ("the EEOC's two-year investigation" of a claim subject to the ministerial exception, "together with the extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement with [religious] judgments"); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 (8th Cir. 1991) (chaplaincy decisions are "*per se* religious matters and cannot be reviewed by civil courts"; "the very process of inquiry" would violate the Religion Clauses (quoting *Catholic Bishop*, 440 U.S. at 502)); *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1577-78 (1st Cir. 1989) (civil court cannot "probe into a religious body's selection and retention of clergymen"; the "inquiry" itself is barred).

This is because, as the Sixth Circuit held, the ministerial exception is a "structural limitation imposed on the government by the Religion Clauses" that "categorically prohibits" judicial "involve[ment] in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015). "[T]he exception is rooted in constitutional limits on judicial authority." *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018). The AG's investigation, which seeks information on internal religious decisions and the selection of *all* employees, exceeds those structural limitations on authority. SPU's injury begins with the investigation itself, and the Court can consider those claims today.

The AG's investigation was already unconstitutional because of its scope. But that's not all: it is also retaliatory (Counts I and XI). A plaintiff may bring a First Amendment claim if a government official's actions were "motivated by retaliation for [the plaintiff] having engaged in activity protected under the First Amendment." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). A retaliation claim "challenges a state action that has been taken against the plaintiff," whereas a pre-enforcement claim challenges a law "before enforcement actions have begun." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022). The injury-in-fact inquiry for retaliation claims is different from pre-enforcement challenges. *See id.* (noting the "different requirements for standing").

In the First Amendment retaliation claims, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Id.* at 1174. Such "chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'" *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020). In the context of church autonomy, constitutional injury can also occur where a "suit and the extended investigation that preceded it [cause] a significant diversion of the [religious school's] time and resources." *Catholic Univ.*, 83 F.3d at 467. Such investigations raise the risk that religious leaders will act "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments[.]" *Id.*

SPU has adequately alleged a chilling effect to establish injury in fact. SPU alleges that the AG's retaliatory investigation and soliciting more complaints has caused a chilling effect on its protected expression and religious exercise. ER-90 ¶ 65; *see also* ER-92-93 ¶¶ 79-84; ER-101-02 ¶¶ 172-78. Without the declaratory and injunctive relief it seeks, SPU "will be subjected to and is already being subjected to … chilling of religious exercise and free expression." ER-90 ¶ 65. The AG's actions have "requir[ed] [SPU] to make decisions about employment under a cloud of government investigation and impending penalties." ER-101 ¶ 165.

Based on "the [AG's] letter and prior conduct by the [AG]'s office, the University believes that if it does not comply with the unconstitutional probe, then it will face serious penalties and litigation against Constitutionally protected actions." ER-90 ¶ 65. The circumstances surrounding the AG's probe show SPU's "objectively justified fear of real consequences" such that the chilling effect "amount[s] to a judicially cognizable injury in fact." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010); *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) ("a church suffers organizational injury because its ability to carry out its ministries has been impaired").

Below, the AG relied on this Court's ruling in *Twitter* to argue the case was not ripe. But SPU's claims are consistent with the Court's ruling in *Twitter*.[2] There, in response to receiving a civil investigative demand (CID) for documents related to its content-moderation policies, Twitter sued Texas AG Ken Paxton for First Amendment retaliation, seeking injunctive and declaratory relief. 56 F.4th at 1172. Evaluating standing under "the retaliatory framework," the Court held that Twitter failed to

---

[2] The AG previously argued that SPU's claims were not prudentially ripe under the now-vacated decision in *Twitter, Inc. v. Paxton*, 26 F.4th 1119 (9th Cir.), *amended & superseded on denial of reh'g en banc*, 56 F.4th 1170 (9th Cir. 2022). *See* ER-71-72. But on reconsideration, this Court abandoned its prudential ripeness holding and ruled on constitutional ripeness grounds, *i.e.*, standing. 56 F.4th at 1173.

show an injury in fact by a chilling effect on its speech. *Id.* at 1175. It found Twitter's claim that "the knowledge that content moderation discussions and decisions are subject to disclosure under the CID" would "impede[]" its "ability to freely make content decisions" was "vague," "refer[ed] only to a general possibility of retaliation," and was "not a claim about the chilling effect of the specific investigation at hand." *Id.*

Here, SPU's allegations of chill are anything but vague. *See supra* pp. 30-31. And SPU alleges more than a "general possibility" of retaliation; it alleges that the AG already has retaliated against it by launching the probe and soliciting more complaints in an effort to further intimidate SPU. SPU's allegations of the chilling effect thus relate to the AG's "specific investigation at hand"—unlike in *Twitter*, where the company expressed general concerns about a "persistent threat" and having "to weigh the consequence of a burdensome investigation every time it contemplates taking action." *Id.*

Furthermore, *Twitter* distinguished retaliatory investigation cases where a plaintiff otherwise "would have had no opportunity to challenge any investigation until formal charges were brough, at which point [it] could have faced a large fine." *Id.* at 1177 (citing *White v. Lee*, 227 F.3d 1214, 1222 (9th Cir. 2000). That's precisely the situation here—there is no mechanism in the AG's investigation for SPU to raise its First Amendment claims. *Infra* pp. 51-55. SPU even tried, and the AG rebuffed the constitutional issues as mere "rhetorical questions." ER-114. SPU

32

accordingly has adequately alleged injury in fact for its First Amendment retaliation claims.

**C. SPU's injury would be redressed by a favorable decision.**

SPU can achieve effective redress from the federal courts. "A plaintiff meets the redressability requirement if it is likely, although not certain, that his injury can be redressed by a favorable decision." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010). The district court held that SPU's claims were not redressable because (1) "This Court doesn't have the power to change the state law," ER-38, (2) "the complaint requests declarations by the Court. But we don't issue advisory opinions," *id.*, and (3) "All of those prayers in the complaint would require investigation regarding who is a minister," ER-39. All three determinations were erroneous.

*First*, SPU is not asking a federal court to change state law. It is bringing an as-applied challenge to the constitutionality of a state law. *See* ER-102 ¶ d (asking the court to "[d]eclare that the Washington Law Against Discrimination cannot be applied to Seattle Pacific University in a manner that violates the University's rights under the United States Constitution"). Federal courts regularly hear such challenges. To pick just one example, *Tingley* was a pre-enforcement challenge to a Washington statute, and that challenge was brought against AG Ferguson.

As *Tingley* illustrates, the appropriate method for bringing such a challenge is to enjoin enforcement by the state officials who enforce the law, and it is perfectly permissible to bring those constitutional challenges in federal court. The district court's contrary ruling on this point parallels one this Court rejected in *Wolfson*. There, Wolfson brought an as-applied challenge to portions of the state canons of judicial ethics, claiming they unconstitutionally restricted his political speech. 616 F.3d at 1052-53. Wolfson sued members of state disciplinary commissions, who claimed the dispute was non-justiciable because "they have no legal authority to change the Code. Instead, that authority is reserved to the Arizona Supreme Court." *Id.* at 1056. This Court rejected that argument: "These defendants have the power to discipline Wolfson," and while it was true that "Wolfson cannot obtain revision of the Code from these defendants, … Wolfson may nevertheless obtain a form of effective redress in this action." *Id.* at 1056-57. That redress would occur "if [Defendants] are enjoined from enforcing the challenged provisions[.]" *Id.* at 1056.

That is the kind of relief SPU seeks here. SPU brought constitutional challenges to a state statute and sued the state's highest law enforcement officer. The district court's conclusion that it could not entertain SPU's constitutional challenge to state law was erroneous.

*Second*, the district court can award SPU declaratory relief. This Court has repeatedly found standing to seek a judicial declaration that a

state law is unconstitutional, particularly when that judgment serves as a basis for injunctive relief. *See, e.g.*, *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 749 (9th Cir. 2020) ("Skyline also sought a declaration that the Coverage Requirement violates its rights under the Free Exercise Clause and a permanent injunction … . We conclude that these forms of relief, which can be treated together for purposes of our discussion, would likely provide Skyline redress."); *Italian Colors*, 878 F.3d at 1179 (affirming modified declaratory and injunctive relief because "a successful as-applied challenge invalidates only a particular application of the challenged law"). In fact, "[i]f a plaintiff has standing to seek injunctive relief, the plaintiff also has standing to seek a declaratory judgment." *Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001), *as amended* (Aug. 15, 2001). This is the kind of relief SPU seeks here: a declaration that the WLAD cannot be constitutionally applied to prohibit SPU's application of its religious hiring policies, and an injunction restraining the AG from enforcing the WLAD in that way.

*Third*, the district court was wrong to rule that it would need to undertake rigorous scrutiny of employment positions at SPU to enter an injunction. The district court treated SPU's claims like a catch-22: either the AG needs to investigate every position and decide who is a minister, or the court needs to do so, therefore the entanglement is inevitable. But none of SPU's pleas for relief would work that way.

In fact, one of SPU's pleas for relief applies to all employees, whether or not they are ministerial. SPU seeks a "permanent injunction prohibiting the attorney general, his assistants, deputies, employees, and those acting in concert with him, from enforcing the WLAD against Seattle Pacific's religious belief and conduct requirements for employees, *regardless of ministerial status*." ER-103 ¶ h (emphasis added). The court need not parse which employees are ministerial to issue relief that applies to all employees, ministers and non-ministers alike. This plea easily satisfies the *Wolfson* standard that it be "likely, although not certain, that [Plaintiff's] injury can be redressed by a favorable decision." 616 F.3d at 1056. On this basis alone, the case should have gone forward.

SPU's other pleas would also provide effective relief from intrusive government investigations. If the AG were prohibited from "enforcing the WLAD against Seattle Pacific's employment actions with regard to ministerial employees," ER-103 ¶ g, or "interfering in matters of church governance and the University's relationships with ministerial employees," ER-103 ¶ f, that would provide an important form of redress for SPU's First Amendment rights. It would not be necessary to decide up front who is a minister and who is not: any determinations about a particular employee could be handled on a case-by-case basis, as they are in the mine run of ministerial exception cases. Here, there is a difference of constitutional magnitude between an individual employee complaint and a university-wide fishing expedition.

This is an application of the First Amendment's ministerial exception: "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady*, 140 S. Ct. at 2060. SPU pleaded that some of its employees are ministerial—at a religious university with a seminary, it could hardly be otherwise. *See* ER-78 ¶ 5; ER-86 ¶ 49; ER-89 ¶ 61; ER-90 ¶ 65; ER-95-96 ¶¶ 104-08.

AG Ferguson charged headlong into disputes over ministerial employees. His letter sought information on "every instance" where a religious hiring policy was applied to "any … University faculty, staff, or administrator." ER-107. He placed no limitations on whether those employees were ministers, and asked for "any documents reflecting such decisions," *id.*, without regard to whether such documents reflect "internal management decisions that are essential to the institution's central mission," *Our Lady*, 140 S. Ct. at 2060. SPU therefore properly pleaded that the AG is investigating hiring decisions of ministerial employees. For the same reasons, it has also properly pleaded that the AG is seeking to interfere in internal management decisions essential to SPU's religious mission. An injunction prohibiting that investigation would redress those violations.

On this point, the district court expressed concern over limiting the powers of the AG. But it is the Constitution that places limits on the AG's power, and SPU asks that those constitutional limitations be enforced

37

here. One such limitation is on the ability of a government official to interfere in the selection of ministerial employees, as described above. The relief SPU sought would redress those constitutional injuries. A second limitation is on government interference in a religious body's internal management decisions.

In addition to its other pleas, SPU also sought injunctive relief against the AG's attempts to probe its internal religious decisions.

As discussed above, a long line of precedent illustrates that SPU will sustain constitutional injuries from the invasive investigation itself, and an injunction that prohibits or limits that investigation would redress that injury. Nowhere did SPU ask the district court to decide which of its employees is a minister. The district court can issue declaratory and injunctive relief related to the specific religious expectations of all employees, as SPU asked (and as statutes like Title VII and Title IX have long provided). *See Maxon v. Fuller Theological Seminary*, No. 20-56156, 2021 WL 5882035 (9th Cir. Dec. 13, 2021) (applying Title IX exemption to religious university). It could also issue relief restricting the application of the law to, or the investigation of, ministerial employees. That latter relief itself would prohibit a wide-ranging probe into every position at the University, and by itself offer SPU redress for some of its constitutional rights.

This would not prevent investigation and adjudication of employment claims that do not infringe SPU's First Amendment rights. If SPU had

an injunction saying that its sexual conduct policy was protected by the First Amendment, then the AG could not bring claims based upon the application of that policy. But he could still bring claims based upon other alleged state-law violations, such as age discrimination.

In that hypothetical case, the AG could bring a claim regarding the dismissal of a particular employee. If SPU claimed the employee was a minister, the court could undertake limited discovery to first determine whether the employee is a minister and whether the case should proceed. If the employee was not a minister, then the case would proceed to full merits discovery, and SPU could raise any additional defenses, such as an argument that the employee was fired for reasons that had nothing to do with his age.

This arrangement is commonplace in cases where a ministerial exception defense has been raised. Courts first permit limited discovery to assess the ministerial exception defense, and then, if the employee is not a minister, order full merits discovery on the employee's claim. *See, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 198 (2d Cir. 2017) ("[T]he district court appropriately ordered discovery limited to whether Fratello was a minister within the meaning of the exception."); *Rayburn*, 772 F.2d at 1165 (noting district court permitted limited discovery focused on the nature of the job where defendant asserted ministerial exception); *see also, e.g.*, *Garrick v. Moody Bible Inst.*, No. 18-cv-573, 2021 WL 5163287, at *2 (N.D. Ill. Nov. 5, 2021) (limited discovery to resolve

ministerial exception first); *Fitzgerald v. Roncalli High Sch.*, No. 19-cv-04291, 2021 WL 4539199, at *1-2 (S.D. Ind. Sept. 30, 2021) (same); *Yin v. Columbia Int'l Univ.*, No. 15-cv-03656, 2017 WL 4296428, at *6 (D.S.C. Sept. 28, 2017) (same); *Grussgott v. Milwaukee Jewish Day Sch.*, 260 F. Supp. 3d 1052, 1053 (E.D. Wis. 2017) (same); *Stabler v. Congregation Emanu-El of the City of N.Y.*, No. 16-cv-9601, 2017 WL 3268201, at *7 (S.D.N.Y. July 28, 2017) (same); *Collette v. Archdiocese of Chi.*, 200 F. Supp. 3d 730, 732 (N.D. Ill. 2016) (same); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, No. 05-cv-0404, 2005 WL 2455253, at *1 (E.D. Pa. Oct. 5, 2005) (same). That kind of limited inquiry is perfectly constitutional in ministerial exception cases involving a specific employee. It is a far cry from the wide-ranging probe of every position at SPU that the AG seeks to carry out here.

\*   \*   \*

SPU brought an as-applied challenge to a state statute and properly pleaded the elements of standing for that claim. SPU also brought as-applied challenges to serious government overreach that is barred by the Religion Clauses and prohibited retaliation under the First Amendment. The AG's investigation injures SPU today, and the relief that SPU requested would redress that injury. SPU's case should be allowed to proceed.

## II. *Younger* **abstention does not apply.**

Federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). *Younger* abstention is "an extraordinary and narrow exception to [this] general rule," *Potrero Hills Landfill, Inc. v. County of Solano*, 657 F.3d 876, 882 (9th Cir. 2011), dictating that federal courts abstain from adjudicating cases that fall into one of "three 'exceptional' categories," *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). These include "ongoing state criminal prosecutions," "civil enforcement proceedings … 'akin to a criminal prosecution,'" and "civil proceedings involving certain orders … uniquely in the furtherance of the state courts' ability to perform their judicial functions." *Id.* at 78-79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).

Even if the proceeding falls into one of these categories, abstention applies "only if" the state demonstrates the presence of "three additional factors" known as the *Middlesex* factors. These factors require the defendant to show that "the state proceeding is 1) 'ongoing'; 2) 'implicate[s] important state interests'; and 3) 'provide[s] adequate opportunity … to raise constitutional challenges.'" *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 588 (9th Cir. 2022) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). "Each element must be satisfied" for abstention to apply. *ReadyLink*

*Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014); *Potrero Hills*, 657 F.3d at 881 n.6.

Before the district court, the AG relied only on *Younger*'s second category—civil enforcement proceedings akin to a criminal prosecution. But the AG's nascent investigation bears no resemblance to an ongoing criminal prosecution. And even if it did, it fails to satisfy two of the three *Middlesex* factors. It is not "ongoing," as multiple courts from multiple circuits have held, and it does not provide SPU with an adequate opportunity to raise any constitutional challenges. For any or all of these reasons, no "exceptional circumstances" exist that "justify [the] federal court's refusal to decide [this] case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) (*NOPSI*).

## A. This is not a quasi-criminal enforcement action.

First and most notably, the AG's investigation is not a civil enforcement proceeding akin to a criminal prosecution. This Court has clearly stated that "the mere 'initiation' of a judicial or quasi-judicial administrative proceeding" is insufficient to invoke *Younger*, since to hold otherwise "would render meaningless the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *ReadyLink*, 754 F.3d at 760 (quoting *Colo. River*, 424 U.S. at 817); *Gilbertson v. Albright*, 381 F.3d 965, 974 (9th Cir. 2004) (en banc) ("the mere existence of parallel proceedings is not sufficient" to invoke the doctrine). To

qualify, enforcement proceedings must bear certain hallmarks of a criminal prosecution—most crucially, the ability to sanction a party for wrongful conduct. *See Sprint*, 571 U.S. at 579-80. Thus, a proceeding qualifies as a civil enforcement proceeding if the state actor can impose civil monetary penalties or seek injunctive relief, *Bristol-Myers*, 979 F.3d at 736; *Citizens for Free Speech, LLC v. County of Alameda*, 338 F. Supp. 3d 995, 1001 (N.D. Cal. 2018), *aff'd*, 953 F.3d 655 (9th Cir. 2020); seek conciliation agreements and consent orders, *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 624 (1986) (citing Ohio Rev. Code Ann. § 4112.05(B)); or issue public reprimands and assess fines, *San Jose Silicon Valley Chamber of Com. PAC v. City of San Jose*, 546 F.3d 1087, 1089 (9th Cir. 2008).

Here, the AG does not even dispute that he currently lacks the ability to sanction SPU in any way. Though he may enforce the WLAD by pursuing alleged violations in court, he never argued to the district court that he could "sanction [SPU] directly" through penalties, cease-and-desist orders, or any other mechanism at the investigative stage. *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014) (refusing to abstain where administrative agency had "extremely limited" authority to sanction). That's because he can't. The WLAD does not vest the AG with adjudicatory authority over complaints or the power to decide cases. That power rests with the Human Rights Commission, which may receive complaints, conduct investigations, and attempt

conciliation, *see* RCW 49.60.240, and with administrative law judges, who may determine cases and issue orders after conciliation has failed, *see* RCW 49.60.250. Where the state official in question has no independent authority to adjudicate a claim and has not taken a claim to state court, it is not the kind of "civil enforcement proceeding" to which *Younger* applies.

Instead, the AG argued—and the district court accepted—that the Supreme Court and this Court have already laid down a categorical rule "ma[king] clear that investigations warrant abstention." ER-34, 41; ER-74-75; ER-46-47. But the cases he cites for that proposition—*Citizens for Free Speech*, *San Jose*, *Bristol Myers*, and *Dayton Christian*—do not espouse a blanket rule; rather, they simply demonstrate that courts should conduct the *Younger* analysis "in light of the facts and circumstances" of each case to determine whether abstention is appropriate. *See Potrero Hills*, 657 F.3d at 881 n.6.

Here, examination of the AG's cases only confirms that the circumstances justifying *Younger* abstention are not present. First, as already described, each of the AG's cases involved enforcement powers not available to the AG during the investigation of an employment-discrimination claim. *See supra* at pp. 42-43. Second, each case involved an investigation that had proceeded far beyond the mailing of a "private letter." ER-7. In *Dayton Christian*, a complaint was filed with the appropriate state commission, which investigated, attempted

conciliation, and "initiated administrative proceedings against [Dayton Christian] by filing a complaint." *Dayton Christian*, 477 U.S. at 623-24. In *Bristol-Myers*, plaintiffs sought federal relief "nearly six years after the state-court litigation began." 979 F.3d at 735. In *Citizens for Free Speech*, plaintiffs had already received a formal notice of abatement with orders to remove certain signs within ten days or face fines, and a hearing had been set before an administrative tribunal "to determine whether the Signs violate the Code." 338 F. Supp. 3d at 1001, *aff'd*, 953 F.3d 655. And in *San Jose*, the action was filed after "the local governmental entity established by the City to enforce its campaign finance laws" had "investigated Plaintiffs' activities[,] concluded that Plaintiffs had violated section 12.06.310[, and] decided to issue a public reprimand and to assess a fine against Plaintiffs." 546 F.3d at 1089.

Thus, far from laying down the bright-line rule the AG desires, these cases merely reinforce the common-sense notion that if a plaintiff waits too long for a state investigation to unfold, he cannot seek vindication of his constitutional rights in federal court. But they come nowhere close to outlining a per se rule that "an ongoing investigation is enough to trigger *Younger* concerns." ER-41 (citing *Citizens for Free Speech*, 953 F.3d 655). Indeed, *Citizens for Free Speech* illustrates the AG's attempts to read far too much into these cases. There, county officials initiated a nuisance abatement proceeding against a group that had displayed signs containing political messages. 338 F. Supp. 3d at 1001. This Court

concluded that the abatement proceeding amounted to a quasi-criminal enforcement because "[t]he County's abatement action included an investigation, alleged violations of nuisance ordinances, notice to appear before a zoning board, and the possibility of monetary fines and/or forcible removal of Citizens's billboards." 953 F.3d at 657. Thus, *Citizens for Free Speech* bears no resemblance to the facts here, where the investigation has not progressed to formal conclusions of law, let alone proceedings in a tribunal of any kind, and where the AG lacks any ability to sanction SPU. The AG's investigation is simply not the kind of quasi-criminal state enforcement proceeding to which *Younger* applies.

## B. Even if the AG's investigation qualifies as a proceeding, such proceeding is not ongoing.

Even if this Court were to hold that the AG's investigation qualifies as a civil enforcement proceeding, *Younger* abstention still would not apply. Courts should abstain "only if" all three *Middlesex* factors are satisfied. *Lara*, 37 F.4th at 588. Here, the AG's investigation cannot satisfy the first criterion—that of an "ongoing" proceeding. Indeed, numerous appellate and district courts across the country have held that preliminary investigations exactly like this one—where the investigation has not proceeded to a "formal enforcement proceeding"—are not "ongoing" under *Middlesex*. *See, e.g.*, *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 519 (1st Cir. 2009). Neither the AG nor the district court have provided any reason for this Court to chart a different course.

46

The Fifth Circuit's decision in *Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483 (5th Cir. 1995), is instructive. There, a city commission—empowered to issue probable cause, conciliation, and cease-and-desist orders—notified four private clubs of discrimination complaints, requested information, and "advised them of possible options to resolve the complaint." *Id.* at 1486-87. Just as here, rather than responding, the clubs sought declaratory and injunctive relief, arguing that applying the anti-discrimination ordinance would violate their First Amendment rights to freedom of association. *Id.* at 1488. The Fifth Circuit found *Younger* abstention inappropriate, noting that "the only administrative activity has been the February 1993 letters to the Clubs." *Id.* at 1490. The state action had not progressed nearly as far as in *Dayton Christian*, where the state had already "investigated the allegations, made determinations that probable cause existed, and served formal charges." *Id.* at 1490-91. There, the letters and complaints were enough for pre-enforcement standing, *id.* at 1490, but did not trigger *Younger*.

So too in *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1228 (4th Cir. 1989). After the state sent a "letter to Telco's attorneys specifying violations of state law [concerning charitable solicitations] and inviting them to attend a fact-finding conference," *id.* at 1228, Telco sued, challenging the state law on First Amendment grounds. Again distinguishing *Dayton Christian* based on the more-developed stage of those proceedings, the Fourth Circuit "decline[d] to hold that *Younger*

abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff." *Id.* at 1228-29. To hold that filing a federal lawsuit under "the threat of enforcement … is never appropriate, any opportunity for federal adjudication of federal rights will be lost." *Id.* at 1229. In fact, "the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court." *Id.*

These cases are hardly outliers. Time and again, courts have recognized that preliminary investigations during which a state actor contemplates whether to bring a formal enforcement proceeding are not "ongoing" for *Younger* purposes.

- *PDX N., Inc. v. Comm'r N.J. Dep't of Labor & Workforce Dev.*, 978 F.3d 871, 877, 886 (3d Cir. 2020) (finding abstention "clearly erroneous" where only an audit took place, because "initiation of an audit is insufficient to serve as an ongoing judicial proceeding," but permitting abstention where state proceedings were more advanced).

- *Guillemard-Ginorio*, 585 F.3d at 519 (distinguishing between "the commencement of 'formal enforcement proceedings,' at which point *Younger* applies, versus [a] preceding period involving only a 'threat of enforcement,' during which abstention is not required," and

48

holding that where "no formal enforcement action ha[d] been undertaken" the "agency's investigation … was at too preliminary a stage to constitute a 'proceeding' triggering *Younger* abstention").

- *Mulholland*, 746 F.3d at 813, 817 (refusing to abstain in a "preliminary" investigation where an election board scheduled a "hearing" to discuss possible violations of election law because "[t]he possibility that a state proceeding may lead to a future prosecution of the federal plaintiff is not enough to trigger *Younger* abstention").

- *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1319, 1321 n.2 (N.D. Fla. 2001) (refusing to abstain after an attorney general served civil investigative demands "demand[ing] that the recipient answer broad interrogatories and produce voluminous documents" because "[u]nless and until someone files a proceeding in court, CIDs are simply part of an executive branch investigation"), *aff'd on other grounds sub nom.*, *Major League Baseball v. Crist*, 331 F.3d 1177 (11th Cir. 2003).

- *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1137-38 (D. Mont. 2016) (refusing to abstain after plaintiff received an email informing him of an investigation into whether his advertising campaign as a judicial candidate violated rules of conduct because "[w]hile a proceeding before [Montana's Office of Disciplinary Counsel] has

the potential to be 'akin to criminal proceedings,' ODC's investigation into this case has not progressed beyond the investigation stage").

All these cases stand for the common-sense proposition that an investigation that has not yet resulted in charges or a state court proceeding is not "ongoing" under *Middlesex*. That makes sense: to hold "that abstention is required whenever enforcement is threatened—would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it." *Telco*, 885 F.2d at 1229; *see also PDX*, 978 F.3d at 886 ("If a … proceeding is only imminent[,] that proceeding is not pending or ongoing."). Indeed, the Supreme Court has gone so far as to say that "[a]bsent any pending proceeding in state tribunals," as is the case here, "application … of *Younger* abstention w[ould be] clearly erroneous." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992); *see also PDX*, 978 F.3d at 886 ("abstention 'clearly erroneous'" where a "proceeding is merely threatened").

These cases cannot be squared with the ruling below. Indeed, though SPU raised this argument in its opposition to the AG's motion to dismiss, ER-51-52, the AG provided no response, either in its reply or at oral argument, ER-46-47; ER-34-35. The district court, for its part, simply stated *ipse dixit* that "[t]he ongoing investigation is enough under the law

to show an ongoing civil proceeding," ER-41, without addressing any of SPU's cases. But this conclusion finds no foundation in the case law. To rule otherwise, this Court would have to split with the rule used in the First, Third, Fourth, Fifth, and Seventh Circuits.

The consensus position is that an investigation by a state official, without more, doesn't trigger *Younger* abstention. That is the correct reading of the law and is not in conflict with this Court's prior rulings. The Court should follow the lead of five other circuits.

### C. SPU has no ability to raise a constitutional challenge during the AG's investigation.

As if this were not enough, the AG's investigation flunks yet another *Middlesex* factor. The third and final *Middlesex* criterion requires the defendant to show that the proceeding "provide[s] adequate opportunity … to raise constitutional challenges." *Lara*, 37 F.4th at 588. The AG's investigation here, by contrast, provides no opportunity, let alone an "adequate" one, for SPU to raise a constitutional challenge to the AG's sweeping probe in a state forum. *Id.*

SPU cannot raise any challenge administratively, since the WLAD is completely silent as to any "opportunity to raise federal claims (or, for that matter, any legal challenges)" during the AG's investigation. *See Miller v. Mitchell*, 598 F.3d 139, 146 (3d Cir. 2010) (finding this factor unsatisfied in the context of a juvenile informal adjustment proceeding). Indeed, SPU's attempt to raise these issues with the AG's office led to a

dismissal of those concerns as "rhetorical questions" and a further demand for documents. *See* ER-89 ¶ 62; ER-114-15.

Courts have held that a plaintiff can raise constitutional challenges "where a litigant may seek judicial review of an adverse [administrative] decision and, in doing so, may raise federal claims." *Citizens for Free Speech*, 953 F.3d at 657; *see also Dayton Christian*, 477 U.S. at 629; *Middlesex*, 457 U.S. at 436. But SPU has no recourse within the AG's office to raise constitutional challenges, nor any direct appeal from the investigation to state court. Therefore, the third *Middlesex* factor does not apply.

Nor is it any answer to suggest that SPU has a remedy in state court. The AG has not filed any state court action against SPU. In fact, a key part of the AG's arguments for dismissal is the notion that "if [SPU] is injured for purposes of standing then there is an ongoing state proceeding for purposes of *Younger*." ER-75. In other words, the "state proceeding" is the investigation itself, not any future contemplated state court action. As SPU has explained, the investigation itself can create constitutional injuries, even before the initiation of any resulting lawsuit.

As described above, the AG's wide-ranging and entangling investigation itself violates SPU's First Amendment rights. *Supra* Section I.B. The Supreme Court has rejected a similar attempt by the NLRB to exercise jurisdiction over teachers at religious schools, noting that "[i]t is not only the conclusions that may be reached by the Board

52

which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Catholic Bishop*, 440 U.S. at 502. The AG's actions cannot be squared with that precedent.

Courts have long warned about the dangers of subjecting religious bodies to entangling inquiries, especially where decisions about ministerial employees may be implicated. The Fourth Circuit cautioned against permitting employment disputes where the decision "involve[s] the church's spiritual functions," noting that such inquiries require "a lengthy proceeding, involving state agencies and commissions ... [wherein] Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Rayburn*, 772 F.2d at 1171; *see also Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 n.1 (10th Cir. 2002) (courts should "resolv[e] the question of the [ministerial exception] doctrine's applicability early in litigation," and thus "avoid excessive entanglement in church matters"); *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 609 (Ky. 2014) (applicability of ministerial exception should be "resolved expeditiously at the beginning of litigation to minimize the possibility of constitutional injury"). Those same harms will occur here, absent judicial intervention.

The AG intends to probe the application of a religious employment standard to all employees, and then to decide for himself which employees are ministerial and which are worthy of further scrutiny, without the oversight of a state court or the possibility of appeal. The constitutional injury begins with that process of inquiry. And "a long line of precedent establish[es] that the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

Thus, if federal courts abstain, SPU will have no way to redress the harm it is experiencing as a direct result of the AG's unconstitutional retaliatory investigation. It will have no way to address the limbo in which the AG's threatened enforcement—unbounded by any potential time parameters—places SPU. As this Court has stated, even when the government chooses not to bring an enforcement action, "[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment." *White*, 227 F.3d at 1228. And as the Fourth Circuit has correctly noted, "[t]he prospect of such prolonged uncertainty cannot but chill a party's First Amendment freedoms." *Telco*, 885 F.2d 1225, 1229. And if it is "never appropriate" for a plaintiff "to bring its First Amendment challenges in federal court" during "the period between the threat of enforcement and the onset of formal enforcement proceedings[,] any opportunity for federal adjudication of federal rights will be lost." *Id.*

Abstention here is not only unwarranted, but unconstitutional. The Court should reverse and remand to allow SPU to vindicate its constitutional rights.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ *Lori H. Windham*

NATHANIEL L. TAYLOR
ABIGAIL ST. HILAIRE
ELLIS LI & MCKINSTRY, PLLC
1700 7th Ave., Suite 1810
Seattle, WA 98101
(206) 682-0565
*ntaylor@elmlaw.com*

*Not admitted to the D.C. bar; admitted to the N.Y. bar; supervised by licensed D.C. bar members.*

LORI H. WINDHAM
LAURA WOLK SLAVIS
DANIEL D. BENSON
DANIEL M. VITAGLIANO*
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lwindham@becketlaw.org*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 12,736 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Lori H. Windham*
Lori H. Windham
*Counsel for Plaintiff-Appellant*

Dated: April 3, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2023, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Lori H. Windham*
Lori H. Windham
*Counsel for Plaintiff-Appellant*

Dated: April 3, 2023

**ADDENDUM**

Pertinent Constitutional Provisions and Statutes

# Table of Contents

**Page**

First Amendment ........................................................................ 60

RCW 49.60.040 ........................................................................ 61

RCW 49.60.180 ........................................................................ 61

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Washington Law Against Discrimination**

**RCW 49.60.040 Definitions**

The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.

\*     \*     \*

**(11)** "Employer" includes any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for private profit.

**RCW 49.60.180 Unfair practices of employers**

It is an unfair practice for any employer:

**(1)** To refuse to hire any person because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, unless based upon a bona fide occupational qualification: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved: PROVIDED, That this section shall not be construed to require an employer to establish employment goals or quotas based on sexual orientation.

61

**(2)** To discharge or bar any person from employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability.

**(3)** To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability: PROVIDED, That it shall not be an unfair practice for an employer to segregate washrooms or locker facilities on the basis of sex, or to base other terms and conditions of employment on the sex of employees where the commission by regulation or ruling in a particular instance has found the employment practice to be appropriate for the practical realization of equality of opportunity between the sexes.

**(4)** To print, or circulate, or cause to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to age, sex, marital status, sexual orientation, race,

creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, or any intent to make any such limitation, specification, or discrimination, unless based upon a bona fide occupational qualification: PROVIDED, Nothing contained herein shall prohibit advertising in a foreign language.